# Federal Defender Services
## Of Wisconsin, Inc.
LEGAL COUNSEL

Daniel W. Stiller, Federal Defender
Joseph A. Bugni, Supervising Attorney
Shelley M. Fite
Peter R. Moyers
Kelly A. Welsh

22 East Mifflin Street
Suite 1000
Madison, Wisconsin 53703

Telephone 608-260-9900
Facsimile 608-260-9901

November 18, 2015

The Honorable James D. Peterson
U.S. District Court Judge
120 North Henry Street
Madison, Wisconsin 53703

    Re:    *United States v. Sally Iriri*,
               Case No. 15-cr-38-jdp

Dear Judge Peterson:

     Ms. Iriri will appear before you for sentencing on Friday, November 20, 2015. At the hearing, I intend to ask you for a sentence of 42 months' imprisonment.

**I.    Ms. Iriri's guideline range is 51 to 63 months.**

     The Court should begin with the properly calculated guidelines range, which is 51 to 63 months in prison. Here, the 2014 version of the guidelines applies because it yields a lower range; guidelines amendments can't increase a defendant's range. The presentence report applies the 2015 guidelines because it concludes, incorrectly, that the range is the same under both versions. Although everyone agrees that theft enhancement under the 2014 version doesn't apply, the report submits that the vulnerable victim enhancement in the 2014 version does apply.

     But it doesn't. Ms. Iriri will not rehash the argument (docket no. 36) in detail again here, but the Court should not be persuaded to apply the enhancement. The first addendum to the report (docket no. 40) relies upon the ages of two victims—71 years-old and 66 years-old—as a basis for adding two offense levels. Without more, this is insufficient because there is no indication that either was especially vulnerable due to age. As a point of comparison, the average age of the judges serving on the Seventh Circuit Court of Appeals is 71 years, 5 months. No one would say that any of the circuit judges is especially vulnerable based on age alone.

**FEDERAL DEFENDER SERVICES**
    **OF WISCONSIN, INC.**

The Honorable James D. Peterson
November 18, 2015
Page -2-

Since the enhancement doesn't apply, under the 2014 version Ms. Iriri's total adjusted offense level is 24. Her criminal history category is I. Her guidelines range therefore is 51 to 63 months. For the Court to rely upon the higher range under the 2015 version would be error.

II. **A sentence of 42 months' imprisonment accounts for the victims' losses, her history and characteristics, and her responsibility for those losses.**

The guidelines set the table for the Court, but they aren't the meat here. Three inter-related issues predominate: the victims' losses, Ms. Iriri's history and characteristics, and her responsibility for those losses.

　　A. **For now, Ms. Iriri herself can only repay the victims with an answer to the question, "Why did she do this to me?"**

The victims' statements ably describe the breadth and depth of the financial losses Ms. Iriri caused. No doubt Ms. Iriri's crime struck the victims like a bolt from the sky, leaving them with the question, among many others, "Why did she do this to me?"

Ms. Iriri's statement attempts to answer this question. It address the victims and how she personally came to do what she did.[1] Her words mostly speak for themselves. Counsel adds only that an apology expressing remorse, shame, and regret, is always a good start, but it's just a beginning, not an end. She can't make the victims financially whole now, and realistically, she'll never be able to. For the present, her statement just provides the victims and the Court with some insight into her crime. And her efforts to assist the federal government in recovering assets for restitution are ongoing, and she will help it in any way it asks of her.

　　B. **Ms. Iriri's history and characteristics reveal how she and her co-defendant were able to reach across borders to defraud so many of so much.**

As a girl growing up in Nigeria, Ms. Iriri did not dream of defrauding Westerners. As an adult, her entry into the world of Nigerian internet scams was not a result of a discrete choice. She didn't wake up one morning, aching with venal greed, and decide to

---

[1] Statement of Ms. Iriri, attached as Exhibit A.

**FEDERAL DEFENDER SERVICES**
   **OF WISCONSIN, INC.**

The Honorable James D. Peterson
November 18, 2015
Page -3-

join this criminal subculture. Rather, she associated with her co-defendant, and each time she had a choice between leaving him or becoming more ensconced in the frauds, she couldn't bring herself to leave. Her role in the schemes delivered a life of material comfort that Nigerian society could not provide her and she never could have imagined. Technology, coupled with a deficit in perception that all human beings have, played crucial parts too.

       **1.**      **Socio-economic factors: poverty, language, and organized crime.**

The socio-economic factors here are critical to any understanding of Ms. Iriri's crime. How do the bad choices of a woman from the developing world result in such disasters thousands of miles away? A variety of socio-economic factors led to the creation and spread of the internet fraud problem in Nigeria, *viz.*, poverty, language, and organized crime. A general description of the problem's provenance shows how Ms. Iriri—someone with so little—could choose to cast her lot with it and produce such calamity across international borders.

Nigerians are very poor, but they shouldn't be. Nigeria ranks in the bottom 20% globally for human development, even though it has the world's 7th largest economy.[2] The discovery of oil in the 1950s was supposed to lift the country out of poverty. Today, it ranks 10th in the world in oil reserves,[3] yet it is the poorest member of OPEC.[4] The per capita yearly income is about $6,000, and the unemployment rate is about 25%. Seven of every ten Nigerians live on less than $2 per day.

---

    [2]    United Nations Development Programme, "Human Development Report 2014: Summary," 18 (2014). The report is also attached, as Exhibit B. The Human Development Index is a composite statistic of education, per capita income, and life expectancy that the United Nations uses to measure a country's human development.

    [3]    "Crude Oil Proved Reserves-2014," U.S. Energy Information Administration, available at www.eia.gov.

    [4]    Exh. B, 18.

**FEDERAL DEFENDER SERVICES**
    **OF WISCONSIN, INC.**

The Honorable James D. Peterson
November 18, 2015
Page -4-

Nigeria's only official language is English—all government and schooling are conducted in English, and only English. Nigeria boasts tens of millions of English-speakers. Its population is about 180 million, and it has the fourth largest English-speaking population in the world.[5]

So, Nigerians speak English and are poorer than they ought to be. But there are lots of countries with large English-speaking populations and diminished life prospects. What makes Nigeria unique is the spread of corruption and the rise of organized crime.

Nigerians were promised a much improved quality of life upon the discovery of its oil; but the promised affluence from the discovery of oil has never materialized.[6] Instead, public corruption ensured that the revenues were diverted to elites and did not reach the populace.

Nigerians know that corruption inhibits long-term economic progress; but in the short-term fraud seems like the only way to "wealth, power, and prestige."[7] Thus, it is unsurprising that the level of social trust in Nigeria is among the world's lowest.[8]

With oil revenues going mainly to elites, and a disaffected and poor populace, organized crime in Nigeria has found fertile ground. "Nigerian criminal enterprises are the most significant [in Africa] and operating in more than 80 other countries in the world. They are among the most aggressive and expansionist international criminal groups and

---

[5]   CIA World Factbook, "Nigeria," available at www.cia.gov (last updated Nov. 4, 2015).

[6]   Kris Helge, "The Success of a Nation's Soccer Team: A Bellweather Regarding A Nation's Electronic Information Infrastructure," 39 N. Ky. L. Rev. 467, 485-86 (2012).

[7]   *Id.* at 491.

[8]   Richard Wike, "Where Trust Is High, Crime and Corruption Are Low," Global Attitudes & Trends, Pew Research Center (Apr. 15, 2008), attached hereto as Exhibit C.

**FEDERAL DEFENDER SERVICES**
  **OF WISCONSIN, INC.**

The Honorable James D. Peterson
November 18, 2015
Page -5-

are primarily engaged in drug trafficking and financial fraud."[9] The losses from their fraud scams are in the billions of dollars per year.[10]

With fraud becoming normalized culturally in Nigeria, the stage for Ms. Iriri's participation in it was set many years ago. She grew up in a violent home in a society without much to offer her. Nigeria's dominant culture would not reward her natural intelligence and zeal for education. She made the right choice by going abroad to the United Arab Emirates, but she chose to associate herself with, and then assist, criminal Nigerian expatriates. By helping one in particular, she was able to live a life of material comfort effectively unavailable to her through lawful work in Lagos. She saw a way to escape Nigeria's poverty and corruption, and she took it.

Ms. Iriri's social circle in Dubai, and then the United States, didn't help. It was limited to other scammers and their hangers-on; internet fraud was again normalized. She was just playing a part in a practice without any stigma in her chosen subculture. Given that the annual losses from these schemes are in the billions, the sad reality is that Ms. Iriri and her co-defendant were small-time participants, albeit successful ones for a time.

> **2.    The role of technology and the difficulty of imagining other people.**

If socio-economic factors made Ms. Iriri willing to commit fraud, technology facilitated her part in the schemes with her co-defendant. Specifically, modern information technology and telecommunications provide internet scammers with a low-cost, global reach. The barriers to entry, relative to other frauds, are minuscule. Compare the elaborate, capital-intensive machinations in David Mamet's *The Spanish Prisoner* to the essentially costless trolling of internet dating sites. Nigerian scammers can reach more potential targets, more cheaply than ever would have been possible before the digital age. And it's never been easier to move cash around the globe. Neither the scammer nor the victim ever has to leave the home.

---

[9]    "African Criminal Enterprises," Organized Crime, Federal Bureau of Investigation, attached hereto as Exhibit D.

[10]    "Millions of Victims Lost $12.7B Last Year Falling for Nigerian Scams," *geektime.com* (July 21, 2014), attached hereto as Exhibit E.

**FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.**

The Honorable James D. Peterson
November 18, 2015
Page -6-

This technological factor also exacerbates the final relevant factor—the problem of human imagination. The telephone and computer help remove a psychological barrier to the commission of the scams. The tools exploit "the difficulty of imagining other people."[11] Professor Elaine Scarry argues that "[t]he difficulty of imagining others is both the cause of, and the problem displayed by, the action of injuring."[12] We harm others "precisely because we have trouble believing in the reality of other persons."[13] As human beings, we all have a "perceptual disability" that, unless we are careful, can result in our harming others.[14]

To illustrate her point, Scarry relies upon a simple thought experiment.[15] Specifically, we are directed "to perform the concrete experiment of comparing an imagined object with a perceptual one—that is, of actually stopping, closing our eyes, concentrating on the imagined face of a friend or a familiar room, then opening our eyes and comparing its attributes to whatever greets us when we return to the sensory world."[16]

The comparison is always striking: "We find at once that the imagined object lacks the vitality and vivacity of the perceived."[17] Even if we attempt the experiment with the imagined face of a loved one or close friend, "one we know in intricate detail," it will be "thin, dry, two-dimensional, and inert" compared to the "actually present face" of the loved one or close friend.[18]

---

[11] Elaine Scarry, "The Difficulty of Imagining Other People," *For Love of Country: Debating the Limits of Patriotism*, Martha C. Nussbaum, ed., 99-110 (Beacon Press, 1996), attached hereto as Exhibit F.

[12] *Id.* at 102.

[13] *Id.*

[14] *Id.*

[15] *Id.* (citing, Jean-Paul Sartre, *The Imaginary: A Phenomenological Psychology of the Imagination*, 133 (Routledge 2004).

[16] *Id.*

[17] *Id.*

[18] *Id.* at 102-03.

**FEDERAL DEFENDER SERVICES**
    **OF WISCONSIN, INC.**

The Honorable James D. Peterson
November 18, 2015
Page -7-

    The experiment also reveals how acute the difficulty of imagining other people is when people who are not close to us are involved. If our capacity to imagine our close friends is so limited, then "the imaginative labor of knowing the other—not an intimate friend, not any single person at all, but instead five, or ten, or one hundred" persons who live in a faraway country—is a grave challenge for us.[19] "What we do not do well in the singular we do even less well in the plural."[20] Scarry concludes that "the human capacity to injure other people is very great precisely because our capacity to imagine other people is very small."[21]

    The computer and the telephone allowed Ms. Iriri to injure her victims at a great distance, and, crucially, without her ever perceiving directly the reality of those injuries. As human beings, each of us has difficulty imagining other people. In Ms. Iriri's case, this difficulty intensified the misery she could cause, *i.e.*, she had no perceptual access to her victims' daily lives prior to her frauds, and she had no such access afterwards to the harmful changes she visited on them. She never had to look any of them in the eye, be in their physical presence, or otherwise observe them doing the things that make a person a realized human being.

    Her conviction and pending sentence make her actions all too real for her now. She notes that she cannot think of the harm she's caused without becoming nauseated. Although the difficulty of imagining others surely played a part in keeping her conscience at bay, she explains how fraught with anxiety her time with her co-defendant was. Part of her always knew that what she was doing was wrong. The material comfort she enjoyed couldn't fully remove the psychic weight of her deceptions. She'll carry her shame with her to prison and beyond forever, but she won't have the burden of dishonest living.[22]

---

[19]    *Id.* at 103.

[20]    *Id.*

[21]    *Id.*

[22]    Exh. A.

**FEDERAL DEFENDER SERVICES**
  **OF WISCONSIN, INC.**

The Honorable James D. Peterson
November 18, 2015
Page -8-

### C. Ms. Iriri's sentence should reflect her responsibility for the financial losses.

Ms. Iriri played an important but subsidiary role in the schemes with her co-defendant. She is unlike the errand boy who picks up lunch for drug traffickers. But she wasn't an owner-director of the enterprise either. She didn't share in the profits of her co-defendant's "jobs;" her co-defendant provided for her expenses but never gave her a "cut." Upon her arrest, she saw herself as a "victim" of her co-defendant, similar to the real victims.

But she wasn't a victim; she was exploited. The gap between her co-defendant's culpability and her own may be profound, but her objective culpability is still significant. If she were a partner, even a junior one, in the enterprise, a sentence between 51 and 63 months might be appropriate. To be sure, her co-defendant paid her expenses for a life of material comfort, but she was essentially an employee who received payment-in-kind rather than cash wages, let alone a share of the spoils.

And her co-defendant was able to exploit her because she didn't have other attractive choices. For a Nigerian woman, the world is not a place of possibilities; life is about scarcity and survival.[23] She is rather unlike the typical white-collar defendant, who comes from affluence and is motivated by a desire to become a bit richer. She wasn't tempted by the possibility of a better life. She was drawn to a life of prosperity unrecognizable to the average Nigerian.

Given Ms. Iriri's culpability relative to her co-defendant, and to the typical white-collar offender, the Court should reduce her sentence below the range, but not by much. A term of 42 months is the right result here. Three and one-half years punishes her enough. And her punishment won't end there. It's near certain that she'll be sent back to Nigeria, which, from her position, is the hardest punishment to take. It's not a place for her—or anyone—to flourish, especially since she'll always be looking over her shoulder for

---

[23]  *See* CIA World Factbook. It's hard to overstate the challenges for Nigerian women. Of every 100 births about 7 infants die. A Nigerian girl born today can expect to live to age 54. A third of the population does not have access to clean drinking water. Less than 30% has access to indoor plumbing. About 210,000 Nigerians—a number about equal to the population of Madison—dies of HIV/AIDS each year. A woman in Nigeria can expect to give birth to 5 children in her lifetime, and only about half of its female population is literate.

**FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.**

The Honorable James D. Peterson
November 18, 2015
Page -9-

retribution from her co-defendant or his associates for getting caught. She can't return to internet fraud, even if she wanted to, because none of her old associates will deal with her.

 Her deportation to Nigeria will be the best insurance for the protection of the public—and she presents a low risk of re-offending. She had good (for Nigeria) jobs in the past, and she'll earn a living above Nigeria's poverty level again. She's an intelligent and college-educated English-speaker, and she can make a life for herself, even if it's not in the United States as she always wanted.

 Thank you for your consideration.

        Kind regards,

        */s/ Peter R. Moyers*

        Peter R. Moyers
        Associate Federal Defender

cc: AUSA Meredith Duchemin
   Ms. Sally Iriri